**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kenneth O. LIPPITT, Defendant–**
**Appellant.**

**No. 98–2385.**

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1999.

Decided June 16, 1999.

Leslie K. Herje (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Alan G. Habermehl (argued), Thomas, Kelly, Habermehl & Wood, Madison, WI, for Defendant–Appellant.

Before POSNER, Chief Judge, and FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

This is a challenge to the district court's decision to add forty-seven months to Kenneth Lippitt's prison term for failing to pay a criminal fine ordered in conjunction with his original drug-related sentence. As part of the court's attempt to compel payment of the fine, Lippitt has been held in civil contempt for over two years, tolling the running of his original sentence. Because he considers the contempt order punitive, Lippitt claims that the new sentence violates the Double Jeopardy Clause of the Fifth Amendment by imposing a second punishment for the same offense. We now affirm the district court's decision.

## Background

Following a federal grand jury indictment on April 26, 1995, Kenneth Lippitt pled guilty to one count of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846. After granting a three-level reduction for acceptance of responsibility, Judge Shabaz sentenced Lippitt to 188 months in prison, the minimum allowed under the applicable sentencing guideline range. The court also imposed a fine of $56,775.96 based on Lippitt's ability to pay. At that time, Lippitt's assets consisted of an entitlement to $46,774.96 in payments from a life insurance policy (to be made in eight monthly installments of $5,846.87) and a one-half interest in a piece of real estate in Milwaukee, Wisconsin worth $20,000. The life insurance payments were to be signed over to the government as they arrived each month starting in December 1995, and the proceeds from the sale of the real estate were due no later than July 5, 1996.

By February 1996, Lippitt had failed to pay any of his fine despite having received the first three life insurance installments. After a hearing on February 21, 1996, the court held Lippitt in civil contempt, enjoined him from dissipating any of his assets and enjoined the insurance company from making further payments on the policy to any party other than the United States. The court then ordered Lippitt committed to the custody of the United States Marshal.[1] Accordingly, his original prison sentence was tolled until he purged the contempt order by either paying the overdue portions of the fine, or making a reasonable effort to do so.

Two years later, having made no payments on the fine except those sent directly from the insurance company to the government, Lippitt moved to vacate the contempt order. He claimed that he had sold the Milwaukee real estate in 1996, could not account for the proceeds, and had no other assets to satisfy the fine. At a hearing on March 27, 1998, Judge Shabaz found that Lippitt had made no effort to recover the first three insurance payments and had willfully transferred his interest in the real estate in violation of the contempt order. The court determined that the transaction was a sham intended solely to avoid paying the fine and that Lippitt in fact retained control over the property.[2] After ordering Lippitt to recover the real estate and make it available as security for the payment of the rest of his fine, the court refused to vacate the contempt order. The order stated, however, that Lippitt could purge it at any time by either producing the property or by showing that he has taken reasonable steps to recover it.

Soon after, the United States moved to resentence Lippitt pursuant to 18 U.S.C. § 3614, which allows the court to increase the sentence (up to the maximum amount which might originally have been imposed) of any defendant who knowingly fails to pay a delinquent fine.[3] Based on its previous finding, the court added another forty-seven months imprisonment to Lippitt's original sentence, bringing the total to 235, the maximum allowed under his sentence range. Because it concluded that Lippitt still controlled the real estate, and therefore remained able to pay at least part of

---

1. The district court had the authority to order confinement for contempt based on 18 U.S.C. § 401. That provision states:

   A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
   (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
   (2) Misbehavior of any of its officers in their official transactions;
   (3) Disobedience of or resistance to its lawful writ, process, order, rule, decree, or command.

2. Evidence presented at this hearing indicated that Lippitt sold the Milwaukee property to Kelly Nolan, a friend of Lippitt's mother, for no money down and without taking back a mortgage. Soon after, Ms. Nolan transferred the property by quitclaim deed to a Mr. James M. Boston. On cross examination Lippitt admitted that he had previously used the name as an alias. This is either a remarkable coincidence or, as the district court concluded, strong evidence of a sham transaction.

3. 18 U.S.C. § 3614 states:

   (a) Resentencing.—Subject to the provisions in (b), if a defendant knowingly fails to pay a delinquent fine or restitution the court may resentence the defendant to any sentence which might originally have been imposed.
   (b) Imprisonment.—The defendant may be sentenced to a term of imprisonment under subsection (a) only if the court determines that—
   (1) the defendant willfully refused to pay the delinquent fine or had failed to make sufficient bona fide efforts to pay the fine; or
   (2) in light of the nature of the offense and the characteristics of the person, alternatives to imprisonment are not adequate to serve the purposes of punishment and deterrence.
   (c) Effects of indigency.—In no event shall a defendant be incarcerated under this section solely on the basis of inability to make payments because the defendant is indigent.

the fine, the court ordered that the contempt incarceration continue.

Lippitt argued that the re-sentencing amounted to a second punishment for failing to pay the fine because it followed over two years of contempt incarceration and therefore, he claimed, violated principles of double jeopardy. The court disagreed, reasoning that the incarceration was intended to compel Lippitt's compliance with the court ordered fine, not to punish him for failing to pay it. Thus the additional sentence was Lippitt's first punishment for that offense and did not implicate the Double Jeopardy Clause. Lippitt now appeals that conclusion.

## Discussion

■■■ The sole issue on appeal is whether Lippitt's re-sentencing violated the Double Jeopardy Clause.[4] The Clause states that no "person [shall] be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Supreme Court has long recognized (and recently re-emphasized) that the Double Jeopardy Clause "protects only against the imposition of multiple criminal punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997) (citing *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1938)). It does not bar the imposition of both a criminal sanction and a civil sanction even when the latter could, " 'in common parlance,' be described as punishment." *Id.* (citations omitted). Thus,

while Lippitt's re-sentencing was a criminal penalty, it must still be shown that the contempt order was also criminal before the Double Jeopardy Clause can apply. *See id.* 118 S.Ct. at 496; *see also S.A. Healy Co. v. OSHRC*, 138 F.3d 686, 687 (7th Cir.1998) (first question in double jeopardy analysis is whether sanction is "civil" or "criminal"). If the contempt order is civil, Lippitt has no double jeopardy claim, despite the fact that "in common parlance" he has suffered twice for the same offense. *See United States v. Ryan*, 810 F.2d 650, 653 (7th Cir.1987) ("[T]he Supreme Court has long held on several different occasions that the imposition of civil and criminal contempt does not violate the Double Jeopardy Clause.") (citing *Yates v. United States*, 355 U.S. 66, 74, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957)).

■■■ The test for determining whether a contempt order is civil or criminal is well established.[5] *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826–27 n. 3, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988); *Shillitani v. United States*, 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Essentially, contempt is considered civil if the sanction imposed is designed primarily to coerce the contemnor into complying with the court's demands and criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future misconduct. *See Hicks*, 485 U.S. at 631–

---

4. We review double jeopardy claims de novo, *United States v. Doyle*, 121 F.3d 1078, 1083 (7th Cir.1997), but defer to the district court's factual findings. *See In re Grand Jury Proceedings of December, 1989 (Freligh)*, 903 F.2d 1167, 1170 (7th Cir.1990) (court's factual findings in contempt proceeding reviewed for abuse of discretion or clear error).

5. Lippitt argues that the Court's decision in *Hudson* effectively overrules the line of cases establishing this test. 118 S.Ct. at 493. In *Hudson*, the Court listed a number of factors relevant to determining whether an adminis-

trative sanction should be characterized as criminal or civil. In so holding, the Court explicitly overruled portions of *United States v. Halper*, 490 U.S. 435, 448–449, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). *Id.* We do not, however, read *Hudson* as implicitly overruling the well established test for determining whether a court imposed contempt sanction is criminal or civil. Nor do we read that test as inconsistent with anything announced in *Hudson*. Therefore, we will analyze Lippitt's claim according to the standards applicable to the characterization of contempt orders.

32, 108 S.Ct. 1423; *Securities Exchange Commission v. Simpson*, 885 F.2d 390, 395 (7th Cir.1989). Because most sanctions contain both coercive and punitive elements, the categorization focuses on "an examination of the character of the relief itself." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (quoting *Gompers*, 221 U.S. at 442, 31 S.Ct. 492).[6] When the contempt order involves imprisonment, if "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus 'carries the keys of his prison in his own pocket'" *id.*, it remains coercive, and therefore civil. Thus, "[t]he paradigmatic, coercive, civil contempt sanction ... involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.'" *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552 (quoting *Gompers*, 221 U.S. at 442, 31 S.Ct. 492). On the other hand, prison terms of a definite, pre-determined length, which do not provide the contemnor an opportunity to purge are generally considered punitive, and criminal. *Hicks*, 485 U.S. at 632, 108 S.Ct. 1423.

In this case, the contempt order issued against Lippitt in February 1996 was clearly coercive. The court found that Lippitt had willfully failed to make payments on his fine despite having the financial ability to do so. The order did not set a definite term of imprisonment but instead specified that "the defendant may purge himself by paying [the fine] ... or in the alternative mak[ing] all reasonable efforts to ensure the recovery of said amounts...." At least initially, therefore, the court's order was a "paradigmatic, co-

ercive, civil sanction." *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552.

But that does not end the inquiry, for what starts as coercive can over time become punitive. *See In re Grand Jury Proceedings of December, 1989 (Freligh)*, 903 F.2d 1167, 1169 (7th Cir.1990); *In re Crededio*, 759 F.2d 589, 590 (7th Cir.1985); *Simkin v. United States*, 715 F.2d 34, 36 (2nd Cir.1983). We must therefore determine if the contempt order lost its coercive effect during the course of Lippitt's civil confinement, leaving punishment as the sole justification for its maintenance.

Here, two circumstances might have transformed the original order into a punitive sanction. First, if Lippitt could not pay the fine (or otherwise purge the order), further imprisonment would obviously lose its coercive effect because he would no longer "carry the keys to his prison in his own pocket." *Gompers*, 221 U.S. at 442, 31 S.Ct. 492; *see Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966) ("[T]he justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order."). In Lippitt's case, however, the district court specifically found that as of March 28, 1998, the defendant had the authority and wherewithal to have the Milwaukee real estate transferred to the government in satisfaction of his fine.[7] At the very least, he always had the ability to make a good faith effort to do so—the court's alternative method of purging.

The continued contempt order could also lose its coercive force if there were simply no reasonable possibility that the contemnor would ever comply with the court's demands. *See In re Crededio*, 759 F.2d 589, 590 (7th Cir.1985); *Simkin v. United*

---

6. For the same reason, little weight is given the label the district court attaches to the contempt order. *Bagwell*, 512 U.S. at 838, 114 S.Ct. 2552. This is in contrast to the deference courts generally accord a legislature's determination of whether a sanction is civil or criminal. *Id.*; *Hudson*, 118 S.Ct. at 493.

7. Although Lippitt's brief suggests he no longer controls the real estate, at oral argument his attorney conceded that he is not challenging the district court's factual findings. The record does not show that those findings are clearly erroneous. *See Freligh*, 903 F.2d at 1170.

*States,* 715 F.2d 34, 36 (2nd Cir.1983); *Lambert v. State of Montana,* 545 F.2d 87, 90 (9th Cir.1976). This situation sometimes arises when grand jury witnesses persist in refusing to testify despite long periods of incarceration. If the contemnor will never comply, continued incarceration can only be considered punitive. As the Ninth Circuit reasoned:

> In view of the length of time the petitioner has remained silent even though in a custodial situation, there exists a substantial likelihood that continued confinement is no longer serving its purpose. If that is true, it may be that the nature and duration of the commitment no longer bear a reasonable relationship to the purpose for which [the contemnor] was committed and that, in fact, the commitment has lost its coercive force, and is now punishment falling under the pale of criminal contempt.

*Lambert,* 545 F.2d at 90.

█ Determining whether there ceases to exist any reasonable possibility that a contemnor will eventually comply is obviously a very difficult task, and is firmly committed to the district court's discretion: "Since a prediction is involved and since that prediction concerns such uncertain matters as the likely effect of continued confinement upon a particular individual, we think a district judge has virtually unreviewable discretion ... as to the merits of this conclusion." *Simkin,* 715 F.2d at 38; *Crededio* 759 F.2d at 591; *see also United States v. Jones,* 880 F.2d 987, 989 (7th Cir.1989) ("All recalcitrant witnesses vehemently insist they will never talk. Trying to differentiate among them is a line of inquiry that is speculative at best and time-consuming and pointless at worst.") While a court certainly need not accept as conclusive a contemnor's claim that he will never comply, it must make an individualized determination of whether "continued confinement retains any realistic possibility of achieving its intended purpose." *Crededio,* 759 F.2d at 591 (quoting *Simkin,* 715 F.2d at 39).

Here, the district court could reasonably conclude that the contempt order might yet secure Lippitt's compliance. During the March 27, 1998 hearing, Judge Shabaz determined that Lippitt had the "authority to have the real estate diverted to the government for the use of restitution. Accordingly, he will remain in contempt of Court until he makes good faith efforts to assign that real estate [to the government]." In re-instating the order, the court altered the terms so that Lippitt could purge it by merely making a good faith effort to help the government secure the real estate. The court implicitly gave up on ever collecting the missed insurance payments, and eliminated their recovery as a condition of lifting the order. It was certainly within the court's discretion to conclude that despite Lippitt's past intransigence, further incarceration, combined with a lighter purging requirement, could induce Lippitt's compliance. *See Freligh,* 903 F.2d at 1170 ("There is no evidence from which to conclude that [the contemnor's] sentence had lost its coercive value and has become only punishment.")

Lippitt's attorney argues that despite the court's findings, the fact that his client has not complied for over two years is conclusive evidence that he never will. Relying by analogy on cases dealing with recalcitrant grand jury witnesses, Lippitt's attorney maintains that after eighteen months, criminal contempt incarceration loses its coercive effect and becomes punishment. *See Crededio,* 759 F.2d at 591. However, aside from contemptuous grand jury witnesses, for whom contempt incarceration is limited to eighteen months by statute, *see* 28 U.S.C. § 1826(a)(2), we have found no authority for the proposition that any specific time period automatically transforms a contempt sanction from coercive to punitive. *See In re Grand Jury Investigation (Braun),* 600 F.2d 420, 427 (3rd Cir.1979) ("The desire for freedom, and concomitantly the willingness to testify, increases with the time spent in prison.") Indeed, to be effective, the length of

coercive contempt incarceration must take into account the length of the underlying (and tolled) sentence. While two years of incarceration might signal immutable intransigence for someone whose alternative is immediate freedom, it is less coercive for someone like Lippitt, who will only feel the effects of his decision to comply or not nearly twenty years in the future. More time may be required to convince a person in Lippitt's position that the costs of intransigence are greater than its benefits. Lippitt may properly argue that the time already spent in prison is evidence for the conclusion that he will never comply, but that alone need not compel the district court's determination.

 Having said that, however, we emphasize that the district court has a continuing duty to determine whether its contempt order still has a reasonable chance of coercing Lippitt's compliance. As this court explained in *Crededio*, the district court must "periodically evaluate, [the contemnor's] incarceration at reasonable intervals, or in the court's discretion, when requested by either party." 759 F.2d at 593. This is especially important in light of the fact that, through resentencing, Lippitt has already sustained one criminal punishment for failing to pay his fine. If the contempt order were allowed to become criminal, Lippitt would suffer a second punishment for the same offense in violation of the Double Jeopardy Clause. *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997).

## Conclusion

The district court could reasonably have concluded that continued contempt incarceration might coerce Lippitt into making an effort to pay his fine. Lippitt concedes that he has the ability to do so, and has provided no reason why he will not. We therefore believe that the contempt order was (and remains) primarily coercive rather than punitive. Because it is a civil sanction, the act of re-sentencing Lippitt did not implicate principles of double jeop-

ardy. We therefore AFFIRM the district court's decision.