# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3328

IN RE: GRAND JURY PROCEEDINGS OF THE
SPECIAL APRIL 2002 GRAND JURY

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 GJ 369—**Charles P. Kocoras,** *Chief Judge.*

———————

ARGUED SEPTEMBER 22, 2003—DECIDED SEPTEMBER 25, 2003
OPINION SEPTEMBER 26, 2003[1]
OPINION PUBLISHED OCTOBER 3, 2003

———————

Before BAUER, ROVNER and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* The Appellant[2] has been sub-
poenaed as a witness before the April 2002 Special Grand
Jury (hereafter the "Special Grand Jury") and has refused
to answer any questions beyond his name, address and oc-
cupation. The government petitioned the district court to

———————

[1] This appeal was decided by a brief order issued under seal on
September 25, 2003, with a notation that an opinion would follow.
This is that opinion. This opinion was issued initially in type-
script, under seal, on September 26, 2003. Both the September 25,
2003 Order and the opinion were published in typescript seven
days later on October 3, 2003.

[2] In order to maintain the secrecy of the ongoing Special Grand
Jury proceedings, we will refer to this witness as the "Appellant"
or the "Witness."

hold the Appellant in contempt and the Appellant moved to quash the subpoena. The district court granted the petition for contempt and effectively denied the motion to quash after the Appellant persisted in his refusal to comply with the subpoena following a grant of use immunity pursuant to 18 U.S.C. §§ 6002-03. The Appellant is currently incarcerated pursuant to the district court's civil contempt order. Under that order, he will remain incarcerated until he complies with the subpoena, or the Special Grand Jury expires, or the district court determines that continued confinement would not coerce him to testify and would instead become punitive.[3] The Appellant timely filed a notice of appeal, and we have jurisdiction over this appeal pursuant to 28 U.S.C. § 1826(b), the recalcitrant witness statute.[4]

## I.

This is not the first time the Appellant finds himself in civil contempt for refusing to comply with a subpoena. Five years ago in a different jurisdiction, the Appellant was subpoenaed to testify before a different grand jury. At that time, the Appellant refused to answer any question beyond his name, address and occupation on the grounds that to do so would violate his "long held and unshakeable religious,

---

[3] The statute contemplates that the term of a grand jury may be extended and allows for incarceration to continue through any extensions. The maximum term of confinement for civil contempt is eighteen months. 28 U.S.C. § 1826(a).

[4] The statute provides that "[a]ny appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal." 28 U.S.C. § 1826(b). The Appellant filed a notice of appeal on August 28, 2003. Therefore, we are obliged to dispose of the appeal by September 27, 2003.

political and personal beliefs" and because he feared his answers would be used against his friends, relatives and colleagues. The district court held him in civil contempt and incarcerated him for 180 days. The Appellant began a hunger strike on the first day of his imprisonment that continued until his release. He was force-fed while in prison and claims to have suffered a number of medical problems due to his hunger strike. The district court ultimately released him after finding that continued confinement would not coerce the Appellant to testify and would instead become punitive, although the court was careful to note that the Appellant's self-inflicted suffering played no part in the decision to release him.

Now the Witness-Appellant has been served with another subpoena in the Northern District of Illinois to appear before a different grand jury conducting a different investigation than was at issue five years ago. At his first appearance before the Special Grand Jury, the Witness again refused to answer any question beyond his name, address and occupation. The district court granted the Witness use immunity pursuant to 18 U.S.C. §§ 6002-03, and other adequate safeguards were in place. At his second appearance before the Special Grand Jury, the Witness continued to refuse to answer any question beyond his name, address and occupation. As the grounds for his refusal, the Witness again cited his "long-held and unshakeable religious, political and personal beliefs." He also objected on the ground that he believed his answers would be used against him in unfair, illegal and politically motivated prosecutions. Moreover, he believed he would be persecuted as a result of his testimony. The Witness further refused to answer any questions claiming that the United States government had subjected him to illegal and extensive electronic surveillance that was being used to question him before the Special Grand Jury.

The government petitioned the district court under 28 U.S.C. § 1826 to hold the Witness in contempt for his refusal to answer the questions posed to him before the Special Grand Jury. The Witness moved to quash the subpoena. Before the district court, he argued that collateral estoppel should prevent the government from petitioning the court for contempt. In essence, he maintained that a different district court's finding five years ago that continued incarceration would not coerce him to testify but rather would be punitive was binding on the district court here. He also argued that the government was abusing the grand jury process, that the subpoena and questions posed stemmed from illegal Foreign Intelligence Surveillance Act ("FISA") surveillance, and that his religious and political beliefs as well as his fear of retaliation constituted just cause for his refusal to testify.

The district court found collateral estoppel inapplicable to the government's petition for contempt because of factual differences between the two cases. First, the subject matter of the prior grand jury investigation differed from that of the current investigation. Second, the court found that the Witness's personal convictions, desires and future plans might have shifted over a five-year period in a manner that would lead to his eventual cooperation with the current investigation. Third, the court declined the Witness's invitation to create a presumption that a witness who has previously staunchly refused to testify will refuse again at a later time in a different proceeding.

The court then proceeded to reject each of the reasons the Witness had cited as bases for his refusal to testify. The court rejected for lack of evidence the Witness's claim that, because the government was well aware when it subpoenaed him that he would refuse to testify and would be held in contempt, the government was abusing the grand jury process as a means to incarcerate him. A witness's personal beliefs provided no relief from contempt, the district

court found. The court discounted the Witness's fear of retaliation because the court had granted him immunity and adequate safeguards were in place. As for retaliation by others, the court found that fear of prosecution was not a defense to contempt unless the United States collaborated in any prosecution. The court accepted the government's assertion that it had no intention of sharing information garnered in the Special Grand Jury proceedings.

The court then turned to the ultimate question, whether incarceration under civil contempt would be coercive or punitive given all of the circumstances surrounding the Witness's refusal to testify. The court found that confinement might have the effect of causing the Witness to testify in light of his familiarity with the hardships of prison life, the new subject matter of the investigation, and the increased difficulty of bearing the burdens of prison after the passing of years, among other things.

After a joint motion for clarification on the FISA issue, the district court found that none of the Witness's FISA arguments had any bearing on the contempt proceedings because the Witness refused to answer any question at all, including those that clearly did not arise from any FISA-related surveillance. Even if the FISA surveillance was illegal or unconstitutional, the court ruled, the Witness was not relieved from his obligation to respond to non-FISA related questions and was thus in contempt.

The court therefore ordered the Witness's confinement. On September 5, 2003, the Witness turned himself in to the United States Marshal for incarceration pursuant to the court's order. Under the order, the Witness will be confined until he testifies, or until the expiration of the Special Grand Jury (including extensions), or until the district court determines that confinement is punitive rather than coercive. He appeals.

## II.

On appeal, the Appellant maintains that the district court abused its discretion in finding him in contempt because (1) the government should be collaterally estopped from bringing contempt proceedings against him when the issue of his willingness to testify under threat of incarceration was already litigated five years ago in another jurisdiction; (2) the subpoena and the questions posed in the Special Grand Jury proceedings were the result of illegal and unconstitutional surveillance, according him a complete defense to contempt under *Gelbard v. United States*, 408 U.S. 41 (1972); (3) there is no realistic possibility that the Appellant will ever testify; and (4) the Appellant has a well-founded fear of retaliation against himself and his family which fear entitled him to a hearing on both his apprehensions and the adequacy of the safeguards offered.

## A.

We turn first to the issue of collateral estoppel. The Appellant contends that the government should have been collaterally estopped from seeking contempt for his failure to testify before the Special Grand Jury given another court's decision five years ago that incarceration would not coerce the Appellant into testifying at that time before a different grand jury. In order for collateral estoppel to apply: (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must be fully represented in the prior action. *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995). *See also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 496 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 2249 (2003). The government

maintains that the Appellant failed to meet the first and, therefore necessarily, the second elements of collateral estoppel.

The Appellant notes that the district court in the earlier action found after 180 days of imprisonment that there was no realistic possibility that further confinement would cause the Appellant to testify. The Appellant maintains that nothing has changed during the intervening five years. He opines that the Special Grand Jury is investigating the same matters that were under investigation five years ago and that his beliefs, experiences and character have remained static. As before, he has been granted immunity. He argues in the strongest terms that confinement will not result in his cooperation any more today than it did five years ago. Having fully litigated the effect of confinement on his willingness to comply with a grand jury subpoena five years ago, he contends the government may not relitigate that issue now.

The salient question then is whether another court's finding five years ago that continued imprisonment would not result in the Appellant's compliance with a subpoena requires the same finding now, after the passage of five years, a change of jurisdiction, a change of grand juries and a change of the subject of investigation.[5] The question almost answers itself. Collateral estoppel does not apply because an adjudication that he would not testify under the coercion of imprisonment five years ago is by no means dispositive

---

[5] Our review of the record, which is under seal, reveals that the current investigation differs from the one undertaken five years ago. The Appellant argues that the investigations are essentially the same because both investigations focus on the Appellant's ties to certain organizations. Having reviewed the record, we find that the Appellant sweeps with too broad of a brush in characterizing the investigations.

of his present state of mind. Indeed, one need only review the statements the Appellant made to the grand juries on each occasion to see that his state of mind was influenced by significantly different factors five years ago. At that time, the Appellant refused to testify because of his religious, political and personal beliefs and because he feared his answers would be used against his friends, relatives and colleagues. This time, he again cited his religious, personal and political beliefs but also listed a fear of prosecution and persecution by certain third parties, and the use of purportedly illegal surveillance in procuring his testimony. In addition to a grant of immunity from the court, safeguards were in place that addressed the new concerns he identified as motivating his refusal to testify. As the district court noted, the Appellant is now older, more familiar with the burdens of confinement, and is being offered adequate safeguards. The court was entitled to find that circumstances have changed in the last five years and the Appellant's present state of mind differs from his state of mind five years ago. The prior adjudication thus cannot act as a bar to the government's current petition for contempt.

## B.

The Appellant next contends that his presence before the Special Grand Jury was procured through information gained in illegal FISA surveillance and that the questions posed to him were the fruit of that poisonous tree. He maintains that the government failed to comply with the conditions that FISA imposes on surveillance of a foreign person, and that the illegality of the surveillance provides a complete defense to contempt. He requests discovery and a hearing on the legality of the surveillance so that he can litigate the adequacy of the FISA applications. The record does not reveal whether the district court reviewed the FISA applications, but this Court may rectify any omission

in that regard through independent *in camera, ex parte* review. Indeed, both the government and the Appellant encouraged us at oral argument to review the FISA materials as a means of resolving this dispute. We have done so and conclude that there is no need to disclose any of the FISA materials to the Appellant and that the FISA orders were properly issued.

"When the Attorney General files, as in this case, a sworn affidavit stating that disclosure or an adversarial hearing would compromise the national security of the United States, a review of FISA wiretaps must be conducted *in camera* and *ex parte*." *In re Grand Jury Proceedings, Grand Jury No. 87-4, Empaneled September 9, 1987*, 856 F.2d 685, 687 (4th Cir. 1988) (hereafter "*September 9, 1987 Grand Jury*"). *See also* 50 U.S.C. § 1806(f). Indeed, the Appellant was unable to cite any case in which classified or otherwise sealed FISA applications or orders were released to the subject of the investigation for review, even after indictment. At the time that the Fourth Circuit ruled in *September 9, 1987 Grand Jury*, every FISA wiretap review had been conducted *in camera* and *ex parte*. 856 F.2d at 687 n.3. We have found no cases since that time where the review was conducted in any other fashion. *See United States v. Sattar*, No. 02 CR 395-JGK, 2003 WL 22137012, at *6 (S.D.N.Y. Sept. 15, 2003) (collecting cases finding that no court has ever ordered disclosure of FISA materials rather than conducting *in camera, ex parte* review and cases holding *in camera, ex parte* review constitutionally sufficient). The Appellant suggested at oral argument that this is that one-in-a-million case where disclosure is necessary. Nothing we have found in our review of the record supports his suggestion. We therefore have reviewed the materials *ex parte* and *in camera*.

A federal officer, with the approval of the Attorney General, may apply for an order approving electronic sur-

veillance to acquire foreign intelligence information. 50 U.S.C § 1804. The application is made to a court specially designated for this purpose (hereafter the "FISA court"). *See* 50 U.S.C. § 1803. The Attorney General's approval of the application is conditioned on his finding that it satisfies the criteria set forth in 50 U.S.C. § 1804(a). There are numerous requirements for the applications, all of which we have reviewed for facial validity, but we will focus here on the factors contested by the Appellant.[6] He

---

[6] The full text of 50 U.S.C. § 1804(a) reads as follows:

Each application for an order approving electronic surveillance under this subchapter shall be made by a Federal officer in writing upon oath or affirmation to a judge having jurisdiction under section 1803 of this title. Each application shall require the approval of the Attorney General based upon his finding that it satisfies the criteria and requirements of such application as set forth in this subchapter. It shall include—

(1) the identity of the Federal officer making the application;

(2) the authority conferred on the Attorney General by the President of the United States and the approval of the Attorney General to make the application;

(3) the identity, if known, or a description of the target of the electronic surveillance;

(4) a statement of the facts and circumstances relied upon by the applicant to justify his belief that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(continued...)

6   (...continued)

(5)  a statement of the proposed minimization proce-
dures;

(6)  a detailed description of the nature of the informa-
tion sought and the type of communications or activities
to be subjected to the surveillance;

(7)  a certification or certifications by the Assistant to
the President for National Security Affairs or an ex-
ecutive branch official or officials designated by the
President from among those executive officers employed
in the area of national security or defense and appointed
by the President with the advice and consent of the
Senate—

(A)  that the certifying official deems the information
sought to be foreign intelligence information;

(B)  that a significant purpose of the surveillance is
to obtain foreign intelligence information;

(C)  that such information cannot reasonably be ob-
tained by normal investigative techniques;

(D)  that designates the type of foreign intelligence
information being sought according to the categories
described in section 1801(e) of this title; and

(E)  including a statement of the basis for the certifi-
cation that—

(i)    the information sought is the type of foreign
intelligence information designated; and

(ii)   such information cannot reasonably be ob-
tained by normal investigative techniques;

(8)  a statement of the means by which the surveillance
will be effected and a statement whether physical entry
is required to effect the surveillance;

(9)  a statement of the facts concerning all previous ap-
plications that have been made to any judge under this
(continued...)

challenges the legality of the FISA surveillance on the grounds that he is not an agent of a foreign power, that the facilities at which the surveillance was directed were not being used by an agent of a foreign power, that the information obtained in the surveillance was not properly minimized, and that the information sought by the government could have been reasonably obtained by normal investigative techniques. He also contends that the motivation and intent of the Attorney General in obtaining the surveillance was not to gather foreign intelligence information but rather was to circumvent the more stringent probable cause requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and to criminalize those participating in a particular political movement. Moreover, he asserts that the Attorney General and his agents improperly used their FISA authority to gather information for criminal indictments and to incarcerate the Appellant without any evidence that he violated any criminal law.

---

[6] (...continued)

subchapter involving any of the persons, facilities, or places specified in the application, and the action taken on each previous application;

(10) a statement of the period of time for which the electronic surveillance is required to be maintained, if the nature of the intelligence gathering is such that the approval of the use of electronic surveillance under this subchapter should not automatically terminate when the described type of information has first been obtained, a description of facts supporting the belief that additional information of the same type will be obtained thereafter; and

(11) whenever more than one electronic, mechanical or other surveillance device is to be used with respect to a particular proposed electronic surveillance, the coverage of the devices involved and what minimization procedures apply to information acquired by each device.

In examining the adequacy of the FISA applications, we conduct the same review that the FISA court conducted (and that the district court may have conducted, which, as we noted earlier, is not indicated either way in the record). The FISA court, in reviewing the application, is not to second-guess the executive branch official's certifications. *United States v. Duggan*, 743 F.2d 59, 77 (2d Cir. 1984). "Further, Congress intended that, when a person affected by a FISA surveillance challenges the FISA Court's order, a reviewing court is to have no greater authority to second-guess the executive branch's certifications than has the FISA Judge." *Duggan*, 743 F.2d at 77. We turn then to the FISA court's role in reviewing an application for surveillance. The FISA court is authorized to enter an *ex parte* order approving a request for electronic surveillance if it finds that:

(1) the President has authorized the Attorney General to approve applications for electronic surveillance for foreign intelligence information;

(2) the application has been made by a Federal officer and approved by the Attorney General;

(3) on the basis of the facts submitted by the applicant there is probable cause to believe that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided*, That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States; and

(B) each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power;

(4) the proposed minimization procedures meet the definition of minimization procedures under section 1801(h) of this title; and

(5) the application which has been filed contains all statements and certifications required by section 1804 of this title and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of the statement made under section 1804(a)(7)(E) of this title and any other information furnished under section 1804(d) of this title.

50 U.S.C. § 1805(a).

We have conducted a careful *in camera* and *ex parte* review of the entire record in this matter, and we conclude that the FISA court properly granted the applications. All of the requisite certifications are in order. The Appellant's remaining objections to the legality of the FISA surveillance (specifically, his claims of wrongdoing or illegal intent by the Attorney General) are wholly without basis in the record.

Because the FISA surveillance was not illegal, this Court need not consider the parties' arguments as to whether the illegality of FISA surveillance may serve as a defense to contempt in a grand jury proceeding. The government urges this Court to hold that illegal FISA surveillance is never a defense to contempt in a grand jury proceeding. The Appellant counters that *Gelbard v. United States*, 408 U.S. 41 (1972), provides him a complete defense to contempt when his presence before the Special Grand Jury is procured through information gained in illegal FISA surveillance. *See also September 9, 1987 Grand Jury*, 856 F.2d at 689 (looking to *Gelbard* for guidance in determining the right of a grand jury witness to refuse to testify when the legality of related FISA wiretaps was in question). Because the surveillance was conducted lawfully here, there is no need

to rule on the viability of a *Gelbard* defense in the FISA context. We reserve that issue for another day.

The Appellant also contended that FISA violates the Fourth and Fifth Amendments, and that the unconstitutionality of the surveillance provides him with a defense to contempt. We reserve for another day that question as well. All courts to consider the issue before FISA was amended by the U.S.A. Patriot Act of 2001[7] have found FISA constitutional. *See United States v. Nicholson*, 955 F. Supp. 588, 590 n.3 (E.D. Virginia 1997) (collecting cases upholding FISA against various constitutional challenges). The only court to consider the constitutionality of the post-Patriot Act version of FISA is the Foreign Intelligence Surveillance Court of Review in its only published decision. *In re: Sealed Case*, 310 F.3d 717 (FISA Ct. App. 2002).[8] That court found that the Patriot Act's amendment to FISA permitting the government to conduct surveillance of an agent of a foreign power if foreign intelligence is a "significant purpose" of the surveillance does not offend the Fourth Amendment. The Appellant's argument that the Patriot Act rendered FISA unconstitutional and that FISA violates the Fourth Amendment is conclusory, undeveloped and without citation to authority. Indeed, it is confined to one page of a ninety-page brief in a section titled, "The FISA Statute is Unconstitutional on its Face and as Applied."

> Assessing the constitutionality of a statute is the most delicate task of a federal court. A litigant cannot re-

---

[7] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub.L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).

[8] *See* 50 U.S.C. § 1803(b). Under this section, the Chief Justice of the United States Supreme Court is authorized to publicly designate three judges to a court of review which has jurisdiction to review the denial of any application made under FISA.

quire constitutional adjudication by incanting magic spells or pointing a finger at a particular clause. We decline to consider constitutional arguments that are offered undigested.

*Max M. v. New Trier High Sch. Dist. No. 203*, 859 F.2d 1297, 1300 (7th Cir. 1988). Where the brief does not raise a serious challenge to the constitutionality of a statute and does not supply the background necessary for thoughtful consideration, there is no need to reach the issue. *Max M.*, 859 F.2d at 1300; *Hospital Corp. of Am. v. F.T.C.*, 807 F.2d 1382, 1393 (7th Cir. 1986), *cert. denied*, 481 U.S. 1038 (1987) (issues cannot be preserved in this court merely by being raised or by being developed inadequately).

## C.

The Appellant also maintains that the district court abused its discretion in confining him as a means of coercion because his prior history and current resolve prove there is no reasonable hope that confinement will lead to his testimony. Civil contempt is authorized by 28 U.S.C. § 1826, the recalcitrant witness statute. Section 1826 provides, in relevant part, that when a witness refuses without just cause to testify before a grand jury, a court may summarily order the witness's confinement "until such time as the witness is willing to give such testimony." The period of confinement may not exceed the term of the grand jury, including extensions, and in no event may it exceed eighteen months. 28 U.S.C. § 1826(a). The district court's finding that the Appellant might cooperate in the face of protracted imprisonment is reviewed with great deference. *United States v. Lippitt*, 180 F.3d 873, 878 (7th Cir. 1999), *cert. denied*, 528 U.S. 958 (1999). "Determining whether there ceases to exist any reasonable possibility that a contemnor will eventually comply is obviously a very difficult task, and is firmly committed to the district court's discre-

tion." *Id.*; *See also United States v. Jones*, 880 F.2d 987, 989 (7th Cir. 1989) (trying to differentiate among recalcitrant witnesses who will never talk and those who will submit to the coercive pressure of incarceration is "a line of inquiry which is speculative at best and time-consuming and pointless at worst"); *In re Credidio*, 759 F.2d 589, 591 (7th Cir. 1985) (the determination whether a civil contempt sanction has lost its coercive effect rests within the sound discretion of the district court). Some courts have stated that the district court's assessment of the usefulness of incarceration as coercion is virtually unreviewable. *Simkin v. United States*, 715 F.2d 34, 38 (2d Cir. 1983) (cited with approval in *Credidio*, 759 F.2d at 591). The district court need not accept at face value a contemnor's claim that he will never testify, but the court must make an individualized determination of whether continued confinement retains any realistic possibility of achieving its intended purpose. *Lippitt*, 180 F.3d at 878.

Here, the district court found that, despite the Appellant's past refusal to testify, he was now faced with a new set of circumstances five years later that rendered incarceration potentially coercive. In particular, the court found that (1) the Appellant now had firsthand experience of prison life and its attendant hardships; (2) the new Special Grand Jury was bound to ask him new questions which he might not find incompatible with his steadfastly held convictions; (3) the Appellant, who had been involved in protracted asylum proceedings, had recently drastically changed his position on whether he wished to remain in the United States by agreeing to depart; and finally (4) the world political climate had changed significantly in a way that might abate the Appellant's fears. The court also noted that the passage of years might render a person less able to withstand the deterioration in living conditions that attends incarceration. Considering all of those circumstances, the district court was of the opinion that imprisonment could very well have a coercive effect on the Appellant.

The Appellant focuses his argument on what he characterizes as an unchanged situation. He opines that the investigation is essentially the same as the one conducted five years ago because both involve the same interests. But at oral argument his counsel conceded that the earlier grand jury investigation differed from the current one in that the "players" and the activities investigated have changed. Moreover, he conceded the district court's analysis of the effects of the passage of time on the Appellant's ability to withstand the rigors of prison life. As he did five years ago, the Appellant has begun a hunger strike in prison. His counsel informed the Court that the Appellant was hospitalized much sooner than he was on his prior hunger strike and has lost more weight earlier. Although counsel insisted these changes simply rendered the Appellant more resolved in his refusal to testify, the district court, which properly considered the Appellant's past unwillingness to testify, was entitled to find otherwise and articulated a more than adequate basis for its contempt order. We find no abuse of discretion.

**D.**

Next, the Appellant argues that the district court erred in failing to conduct an evidentiary hearing on his defense of duress. He contends that he sufficiently demonstrated a reasonable and genuine fear of retaliation against himself and his family by third parties if he were to testify. He also fears prosecution based on his testimony. The government contests the legitimacy of the Appellant's fears of prosecution and persecution, but we need not resolve that dispute. As to any fears of prosecution in the United States, immunity has been granted. Any fears of foreign prosecution would not be a defense to contempt in a grand jury proceeding. The Supreme Court has held that "concern with foreign prosecution is beyond the scope of the Self-Incrimination

Clause" of the Fifth Amendment. *United States v. Balsys*, 524 U.S. 666, 673-700 (1998). Thus any Fifth Amendment claim based on fear of prosecution by a foreign government would provide no defense to contempt in a grand jury proceeding. The Court noted an exception for instances in which the United States is granting immunity from prosecution in order to obtain evidence to be delivered to other nations as prosecutors of a crime common to both countries. *Balsys*, 524 U.S. at 698-99. The Appellant claims that this exception should apply to him. That claim is wholly without support in the record.

Moreover, fear for one's own safety and the safety of one's family is not itself "just cause" for refusing to testify, and thus will not provide a defense to civil contempt in a grand jury proceeding. *See Piemonte v. United States*, 367 U.S. 556, 559 n.2 (1961). However, duress may serve as an equitable defense to incarceration for civil contempt if the witness can demonstrate the presence of a palpable imminent danger. *Matter of Grand Jury Proceedings of Dec. 1989*, 903 F.2d 1167, 1170 (7th Cir. 1990) (hereafter *Freligh*). In order to claim duress, a recalcitrant witness must show that, due to an overwhelming sense of immediate danger, he is unable to act freely, to testify, and thus to purge himself of his contempt. *Freligh*, 903 F.2d at 1170. The Appellant has presented no evidence demonstrating immediate danger to himself or his family such that he is unable to act freely in testifying. His evidence is of a generalized, unspecific nature. Furthermore, because the court and the government have offered adequate safeguards, the Appellant may not continue to claim duress. *See In re Grand Jury Proceedings*, 943 F.2d 132, 135 (1st Cir. 1991) (a witness may not frustrate the grand jury's access to information on the basis that he will be put in danger by giving it and, at the same time, reject an offer to remove or minimize the danger). No evidentiary hearing on duress was necessary in light of the

offer of the government and the court to minimize or re-move any danger that may have caused the Appellant to fear for the safety of himself or his family.

### III.

For the reasons stated above, we affirm the district court's judgment.

AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*