In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 01-2950

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RICHARD O'HARA,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 CR 170—**Lynn S. Adelman**, *Judge.*

---

ARGUED MAY 28, 2002—DECIDED AUGUST 20, 2002

---

Before BAUER, POSNER and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Richard O'Hara was convicted of conspiracy to possess stolen property (Count I) and traveling in interstate commerce to commit extortion (Count IV).[1] O'Hara was sentenced to sixty (60) months on each count, to run consecutively, as well as supervised release and a special assessment. On appeal, O'Hara argues that: (1) his due process rights were violated when he was not granted full access to the classified FBI file

---

[1] Count I was contained in the original indictment, which was returned on September 6, 2000. Count IV was added in a superseding indictment, returned on February 6, 2001.

on one of the government's witnesses; (2) the district court erred in dismissing his motion for judgment of acquittal on Count IV; and (3) the district court abused its discretion in imposing consecutive sentences. We find each of these arguments to be without merit.

## Background

O'Hara, an antique art dealer from Chicago, had an ongoing business and sometimes romantic relationship with Marilyn Karos, a Milwaukee art dealer, beginning in about 1991. In the mid to late 1980's, Karos received four antique scientific instruments—three astrolabes and one armillary sphere—as collateral in an independent transaction. Some time later, after researching the origin and worth of the collateral, Karos became aware that at least some if not all of it was stolen.

In 1997, Karos met Zakria El-Shafei. Karos hired El-Shafei to assist her in selling various antique and art works. Among the items Karos asked El-Shafei to sell were some valuable paintings, whose purchase had been financed by O'Hara, and, eventually, the astrolabes and armillary sphere. El-Shafei's lack of success in selling either the paintings and/or scientific instruments became a source of frustration for both Karos and O'Hara.

Karos really became upset upon learning that El-Shafei pawned one of the astrolabes at a jewelry store. She confronted El-Shafei, who returned only some of the items that she had given him to sell. Karos then spoke to O'Hara about the problems she was having with El-Shafei. O'Hara offered to speak to El-Shafei himself in an effort to get the rest of the items back.

After plans to meet with El-Shafei in Chicago failed, O'Hara decided to travel to Milwaukee to confront El-Shafei. O'Hara asked two associates, whose presence he felt would intimidate El-Shafei, to join him. On Novem-

ber 22, 1997, O'Hara and the two men met at his Chicago gallery, drank alcohol, and then drove to Milwaukee. On arriving in Milwaukee, O'Hara and the two men met Karos at a public rendezvous point, from where they all proceeded to Karos's residence.

That night, Karos invited El-Shafei to her home. El-Shafei arrived at Karos's house at approximately 8:00 p.m. and followed her into the basement where he was assaulted by O'Hara and the two men. After a struggle, El-Shafei managed to break free and call 911. When the police arrived, El-Shafei informed them that he had been assaulted by three men, one of whom wore a mask and beat him with a baseball bat. The bat wielder was later identified as O'Hara.

On September 6, 2000, a grand jury returned a three-count indictment charging Karos and O'Hara with violations of 18 U.S.C. §§ 371 (conspiracy to possess stolen goods) and 2315 (possession of stolen goods). A superseding indictment was returned on February 6, 2001, adding two counts of violating 18 U.S.C. § 1952 (interstate travel to commit extortion) against O'Hara.

During trial, the defense counsel brought to the court's attention that potential *Brady* information contained in FBI reports concerning prosecution witness El-Shafei had not been disclosed in response to pretrial discovery requests. The government denied any knowledge of this material and was instructed by the court to contact the FBI. After looking further into the matter, the government requested and was granted an *ex parte* communication with the court to discuss the material in El-Shafei's FBI file. Following this *ex parte* communication (which was taped and sealed) the court advised counsel for the defense that El-Shafei's file did contain some information it deemed *Brady* material to which the defense was entitled. However, the court determined that disclosure of the *Brady* material implicated the Classified Information Procedures Act ("CIPA").

Pursuant to CIPA, the district court then reviewed El-Shafei's file *in camera.* The court found that the majority of the information contained therein was not *Brady* material and had no likelihood of impacting the trial. The court identified ten statements that he felt should be disclosed under *Brady* and the government agreed to declassify the identified material, which was placed under protective order.[2] The defense was granted a continuance until March 19, 2001, in order to investigate and call witnesses (the sources for three of the statements were declassified) based on the newly disclosed information.

When the trial resumed, O'Hara elected not to call any witnesses. On March 19, 2001, O'Hara was found guilty of conspiring to possess stolen property (Count I) and traveling in interstate commerce to commit extortion (Count IV). He was sentenced to a total term of 120 months.

## Discussion

### A)  CIPA and Disclosure of Brady Material

As an initial matter, O'Hara argues that any reliance by the government and/or court on CIPA was misplaced because the classified material in question had been discovered after the commencement of trial.

We do not agree that CIPA is limited to pretrial proceedings. We review questions of statutory construction and interpretation *de novo. Masters v. Hesston Corp.*, 291 F.3d 985, 989 (7th Cir. 2002). Section 4 of CIPA reads:

---

[2]  Of the ten statements provided to the defense as *Brady* material, the court read statement numbers 2, 4, 7, and 9, as well as the first sentence of statement number 3 to the jury. Names and other identifying information were not revealed. Rather, sources were generally identified where appropriate (*e.g.*, "former girlfriend").

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

18 U.S.C. App. 3 § 4. Nothing in section 4 nor elsewhere in CIPA limits its invocation and use to pretrial proceedings. To the contrary, when read in its entirety, CIPA contains repeated references to trial as well as pretrial proceedings. CIPA's plain terms evidence Congress's intent to protect classified information from unnecessary disclosure at any stage of a criminal trial. Any other interpretation would be wholly inconsistent with and threaten to undermine CIPA's fundamental purpose—protecting and restricting the discovery of classified information in a way that does not impair the defendant's right to a fair trial. The district court acted within its authority when it relied on section 4 in determining whether the potential *Brady* material in El-Shafei's FBI file was "classified," as that term is defined by CIPA.[3]

---

[3] "Classified information" is "any information or material that has been determined by the United States Government pursuant to Executive order, statute, or regulation, to require protection against unauthorized disclosure for reasons of national security (continued...)

We next turn to the question of whether the timing and manner of disclosing El-Shafei's FBI file amounted to a *Brady* violation. We review the district court's ruling regarding disclosure of claimed *Brady* material, made after an *in camera* review pursuant to CIPA, for an abuse of discretion. *United States v. Plescia*, 48 F.3d 1452, 1457 (7th Cir. 1995). "When a criminal defendant seeks access to confidential . . . files, we rely particularly heavily on the sound discretion of the trial judge to protect the rights of the accused as well as the government." *Id.*

There are three components to a *Brady* violation: (1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. Moreover, evidence for *Brady* purposes is deemed "suppressed" if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Boss v. Pierce*, 263 F.3d 734, 739 (7th Cir. 2001), *cert. denied*, ___ U.S. ___, 122 S. Ct. 1961 (2002).

The evidence at issue here was not suppressed at all. Though discovered during trial, O'Hara had sufficient time to make use of the material disclosed. Delayed disclosure of evidence does not in and of itself constitute

---

[3] (...continued)
and any restricted data, as defined in paragraph r. of section 11 of the Atomic Energy Act of 1954 . . . ." 18 U.S.C. App. 3 § 1.

a *Brady* violation. *United States v. Walton*, 217 F.3d 443, 450-51 (7th Cir. 2000); *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996). The government acted promptly to ensure *Brady* compliance once the evidence was discovered, and the court proceeded cautiously to avoid prejudice and ensure compliance with applicable law. O'Hara was provided all information the court concluded to be *Brady* material after *in camera* review.[4] He was also appropriately granted a continuance to further investigate and determine if the preparation and presentation of additional witnesses was necessary. *Walton*, 217 F.3d at 450-51 (noting continuance as an appropriate remedy for belated disclosure); *United States v. Kelly*, 14 F.3d 1169, 1176 (7th Cir. 1994) (same). No *Brady* violation occurred; any evidence potentially favorable to O'Hara on the issue of El-Shafei's credibility was disclosed with plenty of time for him to make use of the information.

### B) Travel Act

We review the district court's denial of O'Hara's motion for judgment of acquittal on Count IV *de novo*. *United States v. Griffin*, 194 F.3d 808, 816 (7th Cir. 1999). A motion for judgment of acquittal should only be granted if there is insufficient evidence to sustain the conviction. *United States v. Jones*, 222 F.3d 349, 351-52 (7th Cir. 2000) (citing Federal Rule of Criminal Procedure 29(a)). In considering the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and will overturn a conviction only if the record contains no evidence on which a rational jury could have returned a guilty verdict.

---

[4] After reviewing the confidential and sealed record, we are satisfied with the district court's *Brady* analysis.

Count IV charged O'Hara with violating the Travel Act, 18 U.S.C. § 1952, which prohibits travel in interstate commerce with the intent of promoting or engaging in extortion in violation of state law. *See* 18 U.S.C. § 1952(b)(2) (defining the term "unlawful activity" to include extortion under state law). O'Hara first argues that the Travel Act is unconstitutionally ambiguous. We disagree.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Collins*, 272 F.3d 984, 988 (7th Cir. 2001), *cert. denied*, ___ U.S. ___, 122 S. Ct. 1938 (2002) (citations omitted). The goal of the void-for-vagueness doctrine is to ensure that defendants are given "fair and reasonable warning." *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 987 (7th Cir. 1999). Where, as here, the constitutional challenge for vagueness involves no First Amendment issue, we evaluate it in light of the statute's application to the facts of the case. *Collins*, 272 F.3d at 988.

We believe that O'Hara had more than fair and reasonable warning that his conduct was violative of the Travel Act. The Act plainly prohibits crossing state lines to promote or engage in extortion. O'Hara did just that. He traveled interstate between Milwaukee and Chicago for the *sole purpose* of threatening and assaulting El-Shafei in an attempt to extort the stolen goods that were in El-Shafei's possession. Without question, the terms of the Act provide due notice that such conduct is illegal.

Despite the Travel Act's clear prohibition against the extortionist activity in which O'Hara engaged, O'Hara goes on to argue that the Act is nonetheless inapplicable to his conduct because it is limited to combating organized crime. While we have recognized that the kind of

unlawful activity the Act seeks to curtail is often and/or characteristically pursued by organized crime, nothing in the Act or the decisions of this Court imposes such a blanket limitation. Indeed, we have approved use of the Travel Act to obtain a conviction outside the context of organized crime where the use of interstate travel related "significantly, rather than incidentally or minimally, to the illegal activity." *United States v. McNeal*, 77 F.3d 938, 944 (7th Cir. 1996) (citations omitted). So long as the evidence presented establishes such a relation and otherwise satisfies the elements of a section 1952 violation, as it did in this case, a conviction under the Travel Act may be obtained regardless of the defendant's involvement or lack thereof in organized crime.[5]

Lastly, O'Hara argues that adding Count IV in the February 6 superseding indictment amounted to vindictive prosecution. A defendant seeking to prove prosecutorial vindictiveness for a decision to indict must present objective evidence showing genuine vindictiveness. *United States v. Spears*, 159 F.3d 1081, 1086 (7th Cir. 1998). O'Hara claims that the decision to supersede was made because he challenged the court's jurisdiction over the

---

[5] The Seventh Circuit pattern jury instructions define the elements of a section 1952 offense as follows:

> First, the defendant traveled or caused another to travel in interstate or foreign commerce . . .;

> Second, the defendant did so with the intent to . . . commit a crime of violence to further unlawful activity . . .; and

> Third, thereafter the defendant did commit or attempt to commit a crime of violence to further unlawful activity; promote, manage, establish, carry on an unlawful activity; facilitate the promotion, management, establishment, or carrying on of an unlawful activity; attempt to facilitate the promotion, management, or carrying on of an unlawful activity.

original indictment. The government responds that the decision was prompted when a previously unavailable witness agreed to provide testimony that made the Travel Act count a viable alternative. In light of the prosecution's reasonable explanation, O'Hara's claim of vindictiveness fails.

### C) Consecutive Sentences

The district court's interpretation of the sentencing guidelines is reviewed *de novo*, and its decision to impose consecutive sentences is reviewed for an abuse of discretion. *United States v. Petty*, 132 F.3d 373, 381 (7th Cir. 1997); *United States v. Brassell*, 49 F.3d 274, 279 (7th Cir. 1995).

Section 5G1.2(d) of the 2000 United States Sentencing Guidelines ("USSG"), which were used by the district court, provides: "[I]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G.2(d). Operating under this guideline, the district court imposed a consecutive sentence of sixty (60) months for each count (the statutory maximum), which is less than the total punishment of 151-188 months permissible under the USSG. The district court's reliance on and application of section 5G1.2(d) was correct. *See*, *e.g.*, *United States v. Maggi*, 44 F.3d 478, 481 (7th Cir. 1995) (finding imposition of consecutive sentences "to produce a combined sentence" that is as near as possible to the total punishment allowed for by statute proper under section 5G1.2(d)).

O'Hara contends that the imposition of consecutive sentences was error because section 5G1.2(d) conflicts with applicable sentencing statutes. In particular, he

asserts that section 5G1.2(d) mandates the imposition of consecutive terms, whereas 18 U.S.C. § 3584(a) creates a presumption in favor of concurrent sentences that can only be rebutted by applying a series of factors set forth in 18 U.S.C. § 3553(a). The gist of O'Hara's argument is that because the statute controls, the district court's failure to apply or rely on the section 3553(a) factors at sentencing undermines its imposition of consecutive terms under 5G1.2(d).

In *United States v. Schaefer*, 107 F.3d 1280 (7th Cir. 1997), this Court held that where there is a conflict between the imposition of consecutive sentences under the USSG and the possibility of concurrent terms under sections 3584 and 3553, that conflict is to be resolved by allowing the sentencing court to maintain *discretion* to depart downward. 107 F.3d at 1285. Where, as here, the record indicates that the district court was well aware of its discretion to disregard the mandates of section 5G1.2(d) and impose a concurrent sentence on O'Hara, but chose not to do so after evaluating the circumstances of the case, there is no reversible error.

Equally unavailing is O'Hara's argument that the district court's reliance on section 5G1.2(d), which allows for sentencing increases based on aggravating circumstances (*e.g.*, use of a weapon, serious bodily injury), constituted an *Apprendi* violation. Because a sentence imposed under section 5G1.2(d) cannot exceed the statutory maximum, its allowance for an offense level increase based on aggravating factors does not result in an *Apprendi* violation. *See, e.g., United States v. Parolin*, 239 F.3d 922, 930 (7th Cir. 2001), *cert. denied*, 533 U.S. 923 (2001); *Talbott v. Indiana*, 226 F.3d 866, 869-70 (7th Cir. 2000).

## Conclusion

We AFFIRM the decision of the district court in all re-spects.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-97-C-006—8-20-02