# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1882

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KHALED ABDEL-LATIF DUMEISI,

*Defendant-Appellant.*

———————

**Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 664—Suzanne B. Conlon**, *Judge*.

———————

ARGUED MAY 10, 2005—DECIDED SEPTEMBER 15, 2005

———————

Before FLAUM, *Chief Judge*, and KANNE and WILLIAMS, *Circuit Judges*.

KANNE, *Circuit Judge*. In the years leading up to the 2003 invasion of Iraq, Palestinian Khaled Abdel-Latif Dumeisi was in close contact with the Iraqi Mission to the United Nations ("IMUN"). Dumeisi's relationship with the IMUN (as well as his 1999 trip to Baghdad) was ostensibly related to the publication of his Arabic language newspaper in a Chicago suburb. Certain evidence obtained by the FBI, however, suggested that Dumeisi was actually acting as an agent of Saddam Hussein's Iraqi regime. He was ultimately tried by a jury and convicted for acting in the United States as an agent of a foreign government without prior notification to the Attorney General, conspiracy to do so, and perjury. Dumeisi appeals, alleging a number of evidentiary

and other errors by both the trial court and the Foreign Intelligence Surveillance Act ("FISA") court. For the reasons stated herein, we affirm.

## I.  History

Dumeisi was born in Palestine in 1946. In 1948, he moved to Jordan, then to Kuwait in 1970. Finally, in March 1993, Dumeisi emigrated to the United States. Thereafter, he began publishing an Arabic language newspaper out of Burbank, Illinois. The paper was initially called "Palestine," but was more recently titled "*Al-Mahjar*," which translates to "place of immigration." Dumeisi received revenue from advertisers and distributed new issues of the free paper every three or four weeks. *Al-Mahjar* primarily contained articles about Middle Eastern politics. Dumeisi published a number of articles in support of Saddam Hussein and against the Iraqi Opposition; Dumeisi felt that the former leader of Iraq was the only Arab leader who had unwaveringly supported the Palestinian cause. Dumeisi sometimes received threats and harassment from Opposition sympathizers.

### A.  Contact with Iraqi Mission to the United Nations

In 1996, Dumeisi hired Kawther Al-Khatib to assist with the newspaper. Although Al-Khatib was a Palestinian, she spoke the Iraqi Arabic dialect fluently. Dumeisi directed Al-Khatib to contact the IMUN in New York City and to notify the personnel there that *Al-Mahjar* was "at their disposal" and would be interested in publishing materials or articles supplied by the IMUN.

After Al-Khatib's initial contact, Dumeisi developed a close relationship with the IMUN and was a guest there on several occasions. On one of his IMUN-sponsored visits to New York, Dumeisi met and interviewed the Foreign

Minister of Iraq. In 1999, at the invitation of the Foreign Minister, Dumeisi traveled to Baghdad for Saddam Hussein's birthday party. After this visit, Dumeisi spoke with Shifiq El-Khalil, an acquaintance since 1992 with whom he shared office space. According to El-Khalil, Dumeisi said that he had been in Iraq to garner support for his newspaper and that the people he met were interested in having him monitor and report on the activities of the Iraqi Opposition in the United States. Shortly after he returned from Baghdad, Dumeisi took another trip to the IMUN in New York. He returned with $3000, which he told El-Khalil he had received from the IMUN. Dumeisi also stated that the IMUN would be calling him at 1:00 P.M. every Thursday to give him "instructions." El-Khalil saw Dumeisi on his cell phone Thursday afternoons, and Dumeisi once told El-Khalil that his IMUN contact placed calls from a restaurant rather than from the IMUN because "it was private and secret conversation."

Dumeisi also discussed his trip to Baghdad with Al-Khatib. He explained that his visit was facilitated by the Iraqi Embassy in Amman, Jordan, so that his passport would not be stamped with an Iraqi entry visa. Dumeisi also told her that he had been met by two members of the *Mukhabbarat*, the Iraqi Intelligence Service ("IIS"), who had pre-set a full schedule of activities for him while he was in Baghdad. Some time after his return to Illinois, Dumeisi and Al-Khatib were watching an Arab film in which an intelligence officer was putting a microphone in the handset of a telephone. Dumeisi remarked that the technique was quite primitive and proceeded to show Al-Khatib a silver pen that could be used as a camera and a tape recorder. Dumeisi said that he had received the pen in Baghdad and that he had used it in an Illinois meeting with a member of the Iraqi Opposition. Al-Khatib also observed Dumeisi on his Thursday afternoon phone calls. On one occasion when she tried to overhear Dumeisi's end of the conversation, she

managed only to hear him say, "Lunch is ready. Let the group come." When she asked him about lunch, Dumeisi responded that it was none of her business.

In July 2000, Dumeisi made the acquaintance of former ISS officer Hazim El-Dilemi at the residence of the Iraqi Ambassador to the U.N. in New York. El-Dilemi's cousin, Kassim Mohammed, was an IIS officer stationed at the IMUN. Mohammed introduced Dumeisi and El-Dilemi. Dumeisi described *Al-Mahjar* as a "newspaper for Iraq" and asked Mohammed for financial help for the paper.

In April 2001, at the IMUN celebration of Saddam Hussein's birthday, Dumeisi gave a speech praising Saddam Hussein. After the speech, Dumeisi repaired to the base-ment of the IMUN with El-Dilemi, Mohammed, and several IMUN personnel. Dumeisi again asked Mohammed for financial assistance. Dumeisi indicated that he had been approached by other groups offering him more money to write articles for them but that he had refused, telling the group, "I want to stay with you guys." Dumeisi was given a computer, a fax machine, and some articles to be printed in the next issue of *Al-Mahjar*. At Mohammed's request, Dumeisi provided press identification cards for himself, El-Dilemi, and IIS officer Saleh Ahman. These identification cards purported that Dumeisi, El-Dilemi, and Ahman were employees of *Al-Mahjar*, and would allow them to gain entry to meetings inaccessible to a diplomat.

As previously mentioned, it was not uncommon for Dumeisi to receive angry or even threatening phone calls from members of the Iraqi Opposition upset by *Al-Mahjar*'s pro-Saddam stance. In fact, Dumeisi reported to IMUN officials that his tires had been slashed as a result of a particular article that he had written. Office-mate El-Khalil once asked Dumeisi why he invited such trouble with his pro-Saddam, anti-Opposition articles. Dumeisi replied that it was a means of learning the identity and whereabouts of

Opposition members. When El-Khalil recommended that Dumeisi turn over the answering machine tapes with the threatening messages to the Chicago police, Dumeisi said that he had sent the tapes to the IMUN.


*B.  The Baghdad File*

One of the most important pieces of evidence in Dumeisi's trial has an interesting history all its own. It begins with Dumeisi's female part-time employee, named Wafa Zaitawi, who delivered newspapers for him. Zaitawi also sold long-distance telephone service for FoneTel.

Fawzi Al-Shammari was a member of the Iraqi Opposition in the United States. He had been a general in Saddam's military, but defected to the United States in 1986 and created an organization, called the Iraqi Officers' Movement to Save Iraq, dedicated to overthrowing Saddam Hussein. Al-Shammari was recognized as a possible successor to Saddam Hussein in the event of a regime change, and he had received publicity in numerous newspapers, magazines, and television programs in the United States.

In early 2002, Al-Shammari received a phone call from a friend of his, who also happened to be a friend of Zaitawi, suggesting that he call Zaitawi to get a good deal on long-distance telephone service. This mutual friend also hinted that Al-Shammari might form a more personal relationship with Zaitawi. Al-Shammari purchased long-distance service from Zaitawi, and the two did, in fact, "hit it off" on a personal level. They exchanged photographs and went so far as to discuss the possibility of marriage.

In March 2002, Al-Shammari traveled to Chicago, using the trip as an opportunity to meet Zaitawi in person and to make two public speeches against Saddam Hussein's regime in Iraq. The speeches went well, but the matchmaking did not. Al-Shammari was "shocked" at Zaitawi's appear-

ance—apparently quite different from her photo—and abandoned all thoughts of marriage when she picked him up at the airport. Nevertheless, to be diplomatic, he gave her a necklace, went home with her to meet her daughters, and took her to his hotel cafeteria for some snacks. Al-Shammari did not call Zaitawi again after he left Chicago.

As a FoneTel employee, Zaitawi had access to the records of customers' calling activity. IIS records recovered in Iraq after the fall of Baghdad in 2003 contained listings of telephone numbers called from Al-Shammari's telephone in Zaitawi's handwriting. These documents were part of a larger collection of IIS records which came to be known as "the Baghdad File." The file also contained a report in Dumeisi's handwriting on one of Al-Shammari's anti-Saddam speeches in Chicago. This report identified Al-Shammari as the leader of a possible successor government in Iraq, and contained photographs of Al-Shammari and the names of two of Al-Shammari's associates who had accompanied him to Chicago.

The Baghdad File contained correspondence between IMUN personnel in New York and IIS headquarters in Baghdad. This correspondence referred to Dumeisi as "Symbol Sirhan"; symbols were considered IIS "sources" as opposed to fully vetted "agents." The IMUN communicated with the IIS regarding Dumeisi's relationship with Zaitawi and Zaitawi's relationship with "the Criminal Fawzi Al Shammari." This communication also reported on the plan prepared for Dumeisi to "start moving on hostile organizations in Chicago and Detroit, and to monitor the activities of group leaders for the so-called opposition in The United States of America." Among other things, Dumeisi was to "exploit his friend [Zaitawi], who works for a communication company" in achieving that goal. This correspondence preceded a summary of Al-Shammari's activities in Chicago, Al-Shammari's telephone numbers and records, and Dumeisi's handwritten report. On May 22, 2002, the IIS

directed the IMUN to continue to provide information on Al-Shammari. The IMUN did so in June and August 2002, with further reports and an indication that Dumeisi was paid $877.65 for expenses.

John Andrews was the American counterintelligence officer who obtained the Baghdad File in Iraq. Andrews was assigned to Baghdad in late May 2003. He was part of the Iraq Survey Group, an interagency organization created for the purpose of exploiting documents and locating weapons of mass destruction following the invasion of Iraq. Andrews met weekly with Aras Kareem, a member of the Opposition group known as the Iraqi National Congress ("INC"). Kareem gave Andrews a number of documents that the INC had found. Andrews would typically have the documents translated and, if they did not appear to have a nexus to the Department of Defense, turn them over to the FBI office in Baghdad. Andrews testified at trial that Kareem gave him the Baghdad File, contained in a blue and clear plastic folder, sometime in June 2003. Having determined that it contained some U.S. telephone numbers, Andrews turned it over to the FBI about two days later.

### C.  FBI Investigation and Searches

The FBI became interested in Dumeisi as early as 1999. While Dumeisi was in Baghdad, two agents visited his office asking for him. In November 2002, the FBI questioned Dumeisi's friend and former *Al-Mahjar* contributor Riad Rabah about Dumeisi. At the FBI's direction, on April 30 and May 1, 2003, Zaitawi made consensually monitored calls to Dumeisi from the federal building in Chicago. She told him that the U. S. Attorney's office would be questioning her under oath and that the FBI had obtained Al-Shammari's phone records from Baghdad. When she asked Dumeisi what he had done with the records and how they might have gotten to Iraq, Dumeisi told her that he didn't know.

On May 7, 2003, FBI agents conducted consensual searches of Dumeisi's office and home. The agents confiscated a 1996 calendar covered almost completely with Arabic writing and phone numbers. A loose piece of paper inside the calendar contained two columns of five Arabic words in each. The English translations for these ten words are as follows: Abu Mohammed, New York, Taking Things, Important Items, Threat, The Father, Home, Advertisements, The Wedding, and Inoperable Car. At trial, the government contended that these were code words.

After the searches, Dumeisi complained to his friend Rabah (who had previously been questioned about Dumeisi) that the FBI had taken his computers, rendering him unable to work. Dumeisi also told Rabah that "the group"—a colloquial way of referring to the IMUN, according to Rabah—wanted Dumeisi to gather information on Al-Shammari. Dumeisi said that he had asked Zaitawi to gather information, that it had something to do with telephone numbers, and that he had passed this information on to "the group" along with an indication that Al-Shammari might be the next president of Iraq if Saddam Hussein's regime were overthrown.

### D. Testimony in Grand Jury and Immigration Proceedings

On September 17, 2002, INS Special Agent Angela Alonzo-Onate conducted a videotaped interview of Dumeisi in connection with his application for United States citizenship. Dumeisi was asked if he had "ever worked for, [or] on the behest of a foreign government," and he responded negatively by shaking his head. He was also asked whether he had "ever failed to register as an agent of a foreign power[,]" to which Dumeisi responded, "No." When asked if he had ever provided services to Iran, Iraq, or North Korea, Dumeisi stated, "Um, no." Finally, when asked whether he had "ever received any property or compensation from a

foreign power[,]" Dumeisi responded saying, "No."

Shortly after the FBI searches of his home and office, in May 2003, Dumeisi testified before a grand jury. He acknowledged his contacts with the IMUN, claiming they were related to writing and publishing his newspaper. Dumeisi testified that Zaitawi gave him Al-Shammari's telephone records at some point after Al-Shammari's visit to Chicago. Dumeisi further stated that Zaitawi told him Al-Shammari was a member of the Iraqi Opposition, and that she wanted Dumeisi to check him out because he had asked for her hand in marriage. Dumeisi claimed not to know what happened to the records after he had placed them on his desk.

*E. Trial*

On July 16, 2003, Dumeisi was indicted for acting in the United States as an agent of a foreign government without prior notification to the Attorney General (in violation of 18 U.S.C. § 951(a)); conspiracy to do so (in violation of 18 U.S.C. § 371); perjury in an immigration proceeding (in violation of 18 U.S.C. § 1621); and perjury before a federal grand jury (in violation of 18 U.S.C. § 1623). A jury trial commenced on January 5, 2004, and a week later Dumeisi was found guilty on all four counts. He was sentenced to 46 months' imprisonment.

## II. Analysis

Dumeisi appeals his conviction on six different grounds. First, he argues that the Baghdad File was erroneously admitted in evidence. Second, he claims that both the Classified Information Procedures Act ("CIPA") and the FISA were misapplied. Dumeisi also asserts that jury instructions concerning the publication of a newspaper article and on the law of conspiracy were improper. Finally,

he argues that there was insufficient evidence against him for his convictions on all counts. We address each of these arguments in turn.

### A.  Admission of the Baghdad File

Dumeisi filed a motion *in limine* objecting to the admission of the Baghdad File. He described the Baghdad File as "the single most important piece of government evidence," but asserted that it was unauthenticated hearsay. The government responded that the Baghdad File was admissible under Federal Rule of Evidence 807, the residual exception to the hearsay rule, as well as under Rule 803(6) (business records), Rule 803(8) (public records), and Rule 801(d)(2)(E) (co-conspirators' statements). The district court postponed ruling on this matter until trial was underway, ultimately admitting the evidence under Rule 807.

We review a district court's ruling on the admissibility of evidence for abuse of discretion. *See Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 722 (7th Cir. 2003); *United States v. Sinclair*, 74 F.3d 753, 758 (7th Cir. 1996). "Trial courts have a considerable measure of discretion in deciding when a hearsay statement fits the residual exception." *Sinclair*, 74 F.3d at 758 (internal quotation omitted). We reverse only when no reasonable person could take the view of the trial court. *Chemetall*, 320 F.3d at 722 (citation omitted).

We first tackle the question of whether the Baghdad File was properly authenticated. Federal Rule of Evidence 901(a) requires, as a condition precedent to admissibility, "evidence sufficient to support a finding that the matter in question is what its proponent claims." Authentication can be established in a variety of ways, including by "[t]estimony of [a] witness with knowledge . . . that a matter is what it is claimed to be[,]" Rule 901(b)(1), and by distinctive characteristics such as "[a]ppearance, contents, sub-

stance, [or] internal patterns . . . taken in conjunction with circumstances[,]" Rule 901(b)(4). Dumeisi challenges authentication under both methods.

The government presented "Mr. Sargon"[1] as a "witness with knowledge" who could identify the Baghdad File as genuine IIS records. Indeed, Sargon had worked for the IIS from 1979 to 2003 and had advanced in rank to a high position not spoken on the record but made known to the jury. He had been assigned to posts outside of Iraq, including the United States, and had knowledge of the IIS missions as well as the organizational structure of the IIS. Sargon worked in Directorate M4, the group concerned with external intelligence, from 1999 to 2003. In that role, he had regular contact and information exchange with the M40 Directorate, which was responsible for "hostile activities," or opposition groups within and outside of Iraq. Sargon unequivocally testified that he could "positively identify [documents making up the Baghdad File] as Iraqi Intelligence cables, as well as correspondence between the New York Station and M40." (Tr. at 406-07.) Sargon was also the primary witness for the second method of authentication used by the government; he identified distinctive characteristics including the style and form of the documents ("in line with the way that the Iraqi Intelligence service will prefer to produce a document"), symbols, codes, abbreviations, and signatures of some fellow IIS officers. (Tr. at 406.) The one thing Sargon did not identify as a typical trait of IIS documents was the blue and clear plastic folder in which the Baghdad File was found.

The "circumstances" which we must consider in conjunction with the physical characteristics discussed above include circumstances surrounding discovery. *See United*

---

[1] Sargon is not the true name of the witness; he testified under an assumed name pursuant to agreement.

*States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (approving introduction of written materials as sufficiently authenticated because they were found in an isolated campsite occupied only by the defendant); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) (finding the fact that drug ledgers were discovered in known drug trafficker's home to be evidence of authenticity). In this case, classified information surrounding the initial discovery of the Baghdad File bolsters the contention that the file is what the government purports it to be.

We find this authentication evidence taken together to be at least as reliable as that relied upon in *United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989). In that case, the defendant was convicted of conspiracy and engaging in illegal exporting activity involving the sale of two aircraft to Libya. *Id.* at 779. The defendant challenged the use of circumstantial evidence to authenticate two documents used to show that the aircraft were purchased by the Libyan military. *Id.* at 785. The Eleventh Circuit held that Rule 901 "requires only some competent evidence in the record to support authentication"; the circumstantial evidence of where the documents were found (in West Germany, in the briefcase of a Libyan arms dealer) was sufficient to authenticate the documents in the absence of any evidence of adulteration or forgery. *Id.* at 785-86. Here, in addition to the circumstantial evidence regarding the discovery of the file alluded to above, we have Sargon's testimony that the file contained genuine IIS documents. The district court did not abuse its discretion in determining that the Baghdad File was properly authenticated under Rule 901.

As stated above, the Baghdad File was admitted under Federal Rule of Evidence 807, the residual exception to the hearsay rule. Rule 807 permits evidence to be admitted if it has sufficient "circumstantial guarantees of trustworthiness." Sargon's testimony, already discussed in the context

of authentication, provides some circumstantial guarantee of the trustworthiness of the statements in the Baghdad File. There were also witnesses at trial who positively identified the handwriting of Zaitawi and Dumeisi on Al-Shammari's phone records and on the report related to Al-Shammari's Chicago visit, respectively. In addition, we have Zaitawi's relationship to Al-Shammari and her access to telephone records. At oral argument, Dumeisi clarified that the hearsay statement with which he takes issue is not so much the individual documents making up the Baghdad File—he concedes that many of the documents are admissible and are IIS communications as they purport to be—but rather with the statement that these documents were found together, *in Baghdad*, especially considering the sketchy circumstances surrounding the file's whereabouts before it was given to Andrews.

Dumeisi raises a valid question with respect to the timing of the discovery of the Baghdad File: if the file was not obtained by Andrews until June 2002, how could the FBI question Zaitawi at least a month earlier, in April/May 2002, about Al-Shammari's telephone records allegedly found in Iraq? We can only point out that the evidence presented at trial, including Andrews's testimony about when he received the file, is not inconsistent with the FBI having knowledge from another source, prior to June 2002, that Al-Shammari's telephone records had been discovered in Baghdad. A review of the classified evidence convinces us that this timing issue is not fatal to the district court's finding of authenticity and trustworthiness; the evidence in fact provides a significant guarantee of trustworthiness that the Baghdad File was found, Dumeisi's contributions and all, in circumstances reinforcing its legitimacy as a coherent file of IIS documents.

Finally, Dumeisi raises a Sixth Amendment issue with respect to admission of the Baghdad File, arguing that the government's failure to present sufficient "indicia of reliabil-

ity" regarding the evidence implicates the Confrontation Clause. *See Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980) (excluding hearsay except under certain circumstances when the evidence is so trustworthy that the rationale for the hearsay rule is not offended), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004) (regarding only testimonial evidence). If evidence is not covered by a firmly rooted exception to the hearsay rule, it must possess particularized guarantees of trustworthiness at least as reliable as evidence admitted under a firmly rooted hearsay exception. *See Idaho v. Wright*, 497 U.S. 805, 821 (1990). Because this argument was not raised in the district court, our review is for plain error; we reverse only if there is a clear or obvious error that affected the outcome of the trial. *See United States v. Shearer*, 379 F.3d 453, 456 (7th Cir. 2004).

Dumeisi correctly points out that the residual hearsay exception is not a firmly rooted exception for Confrontation Clause purposes. *Cf. Wright*, 497 U.S. at 817. But in determining that the Baghdad File was admissible, the district court expressly considered the same circumstantial guarantees of trustworthiness that justify admission of business records and official records without violating the Confrontation Clause. For example, the court relied upon Sargon's testimony that IIS officers had a duty to accurately record their own activities and the information received from their sources. The lack of a motive to falsify information and the fact that written records are often more reliable than the potentially hazy memory of the recorder are the classic reasons for excepting business records and official records from the hearsay rule—in other words, for making them firmly rooted hearsay exceptions. *See Felzcerek v. INS*, 75 F.3d 112, 116 (2d Cir. 1996); *see also United States v. Klinzing*, 315 F.3d 803, 810 (7th Cir. 2003). Thus, the district court did not violate the Confrontation Clause in admitting the Baghdad File.

It was within the court's discretion to admit the Baghdad File under Federal Rule of Evidence 807. The government argues that it would have been proper to admit the file under several other hearsay exceptions as well, including the business records exception in Rule 803(6) and the public records exception in Rule 803(8); however, because we have already found the evidence admissible under Rule 807, it is unnecessary to analyze its admissibility under these rules. Once the court admitted the Baghdad File in evidence, it was within the purview of the jury to assign the file its proper probative weight. *See, e.g.*, *United States v. Hedman*, 630 F.2d 1184, 1197-98 (7th Cir. 1980).

## B.  CIPA Substitution

About a month before Dumeisi's trial began, on December 8, 2003, the government provided him with materials pursuant to the Jencks Act, 18 U.S.C. § 3500. Included in these materials was the grand jury testimony of El-Dilemi, the former IIS officer and government witness who testified at trial about the "spy pen" and his observations of Dumeisi at the IMUN. On a single page of this transcript, El-Dilemi made a statement referencing classified information, which the government had inadvertently failed to redact. Dumeisi's counsel dutifully returned its copies of the page, but, believing that the classified statement was helpful to Dumeisi, filed both a motion for a pre-trial conference under § 2 of CIPA, 18 U.S.C. App. 3, and a motion to dismiss the indictment for discovery violations. On December 31, 2003, the government filed its CIPA § 6 notice relative to the El-Dilemi testimony and requested a protective order prohibiting disclosure of classified information under § 4 of CIPA. After an in camera examination of the classified material, the district court denied Dumeisi's request for a § 2 conference and found that the government had not violated its discovery obligations under *Brady v. Maryland*, 373 U.S. 83

(1976). The court also found that the government's proposed unclassified summary[2] was sufficient so as not to deprive Dumeisi of any potential impeachment value that the information had under *Giglio v. United States*, 405 U.S. 150 (1972).

Dumeisi argues that CIPA was misapplied, and that his resulting position with respect to the information at issue deprived him of his rights to confrontation, effective assistance of counsel, and a fair trial. Both parties invited this court to review the classified information in order to evaluate the district court's decision regarding disclosure of material for abuse of discretion. *See United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). We review questions of CIPA interpretation *de novo. Id.* at 568.

The CIPA's fundamental purpose is to "protect[ ] and restrict[ ] the discovery of classified information in a way that does not impair the defendant's right to a fair trial." *Id.* It is essentially a procedural tool that requires a court to rule on the relevance of classified information before it may be introduced. *See United States v. Wilson*, 901 F.2d 378,

---

[2] The unclassified summary of information concerning El-Dilemi follows in its entirety:

The United States Government has provided Hazim El-Dilemi and/or his family with the following economic and non-economic assistance:

1. The government agreed to provide asylum to El-Dilemi and paid him a total of $1000 in remuneration. The government also paid for El-Dilemi's airplane ticket to the United States. Upon his arrival in the United States, the government provided El-Dilemi with a receipt for an application for a Social Security number that had been obtained for him.

2. The government also provided immigration assistance to relatives of El-Dilemi.

379 (4th Cir. 1990). As Dumeisi concedes, the CIPA does not create any discovery rights for the defendant. The district court appropriately utilized § 4 and § 6 of the act to deal with the use, relevance, and admissibility of the evidence at issue. Section 2 provides for a pretrial conference to establish timetables for discovery and for the procedures established by other sections of CIPA (i.e., the alternative procedures for disclosing classified information in § 6); the court found it unnecessary to conduct this conference, given that the procedures were already underway. This did not violate Dumeisi's constitutional rights; he received a summary of the relevant information, which the court found would provide him with "substantially the same ability to make his defense as would disclosure of the specific classified information," several days prior to trial. To the extent he takes issue with the fact that this information was received only days before trial, we note that "[d]elayed disclosure of evidence does not in and of itself constitute a *Brady* [or *Giglio*] violation." *O'Hara*, 301 F.3d at 569.

Having reviewed the classified evidence, we find that the district court did not abuse its discretion in substituting the government's summary of classified information regarding El-Dilemi for the actual information. Nor did the court err in denying Dumeisi's motion for discovery sanctions against the government; the material does not implicate *Brady*. Finally, the government's summary related to El-Dilemi did not deprive Dumeisi of its potential impeachment value under *Giglio*.

## C. *Surveillance under the FISA*

On August 28, 2003, Dumeisi filed a motion seeking disclosure of any materials related to surveillance under the FISA, 50 U.S.C. §§ 1801-1811, 1821-1829. The district court held a hearing on the motion, at which the government stated that both electronic and physical surveillance had

been conducted on Dumeisi under the FISA. The govern-ment submitted the materials relied upon by the Foreign Intelligence Surveillance Court ("FISC"), and after ex parte, in camera review, the district court concluded that the FISA surveillance was lawful and that disclosure of the materials would endanger national security. The court therefore denied Dumeisi's motions for disclosure of the materials and for suppression of the fruits of all surveillance con-ducted under the FISA. Dumeisi appeals this decision, expressing concern that the facts presented to the FISC in support of the application for surveillance consisted solely of his First Amendment-protected activities as a journalist. We review the district court's ruling on the propriety of the FISC's orders *de novo. Cf. In re Grand Jury Proceedings of the Special April 2002 Grand Jury*, 347 F.3d 197, 204-05 (7th Cir. 2003).

The FISC must make certain findings before authorizing electronic or physical surveillance. *See* 50 U.S.C. §§ 1805(a), 1824(a)(3)(A). For targets that are "United States persons," such as Dumeisi, the FISC must find:

> (3) on the basis of the facts submitted by the applicant there is probable cause to believe that—
>
> (A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided*, That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States[.]

50 U.S.C. § 1805(a)(3). We have reviewed the classified materials relied upon by the FISC and conclude that the government provided probable cause that Dumeisi was an agent of a foreign power entirely independent of any of his journalistic activities. The requirements of §§ 1805(a)(3) and 1824(a)(3) were properly fulfilled, and the district court's ruling must be affirmed.

### D. *Jury Instructions on Newspaper Articles*

At trial, Dumeisi requested Defendant's Instruction No. 5: "It is not a violation of 18 U.S.C. § 951(a) to publish a news article." The court refused this instruction, instead giving the following:

> The First Amendment to the Constitution protects the right to free speech and the freedom of the press. This means that individuals are permitted to express views that are controversial or even despicable. The speech that Mr. Dumeisi gave at the Iraqi Mission and newspaper articles he authored or published are protected by the First Amendment. The speech and newspaper articles, as well as Mr. Dumeisi's opinion and political views, are to be considered only insofar as they may pertain to issues of motive and intent.

(Tr. at 1177-78.) Dumeisi contends that the failure to give his instruction created the "very real probability that the jury's verdict rested on the sole basis that Dumeisi printed articles in his newspaper." The government, for its part, stated in a hearing before the district court that Dumeisi's proposed instruction would be "a bit confusing, because one of the allegations [made against Dumeisi] is that . . . he acted . . . by publishing certain news articles that would enable him to identify opposition members." (Tr. at 1031.) We review the district court's refusal to give a theory of defense instruction *de novo. United States v. Buchmeier*, 255 F.3d 415, 426 (7th Cir. 2001).

We find nothing improper in the district court's instructions with respect to publishing a newspaper article. The limiting instructions to the jury on First Amendment protection—which, we note, were repeatedly given throughout the trial—stated that Dumeisi should not, and legally could not, be convicted simply for publishing unpopular or even "despicable" opinions. A jury is generally presumed to

follow limiting instructions. *See, e.g.*, *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002). Given that an element of § 951 is acting "subject to the direction or control of a foreign government or official," 18 U.S.C. § 951(d), and there was evidence suggesting that Dumeisi published certain articles at the behest of the IIS, we find this publication relevant and agree with the district court that Dumeisi's proposed instruction would have been "misleading as to the law." (Tr. at 1031.) Refusing Dumeisi's proposed instruction did not deprive him of a fair trial; the instruction given meets the concern he raised at trial that his First Amendment-protected speech would be used as the sole basis for a guilty verdict. *See Buchmeier*, 255 F.3d at 426; *United States v. Boykins*, 9 F.3d 1278, 1287 (7th Cir. 1993).

### E.  Jury Instructions on Conspiracy

Dumeisi also appeals the instructions given to the jury on the law of conspiracy. Dumeisi was convicted both of violating 18 U.S.C. § 951, which provides criminal liability for anyone "other than a diplomatic or consular officer or attaché, [who] acts in the United States as an agent of a foreign government without prior notification to the Attorney General," and of conspiracy to violate the same. He argues that the IIS agents alleged to have conspired with him were all diplomatic attachés and thus were legally incapable of conspiring to violate this statute. As we have stated, "[t]he elements of the crime [of conspiracy] are not satisfied unless one conspires with at least one true co-conspirator." *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993) (citation omitted). To that end, Dumeisi proposed two different jury instructions related to the conspiracy count in his indictment. On appeal, he asserts that the district court's refusal of these instructions was wrong as a matter of law. Again, we review the district

court's refusal to give a theory of defense instruction *de novo. Buchmeier*, 255 F.3d at 426.

The first proposed instruction indicated that a diplomat need not inform the Attorney General that he is an agent of a foreign government. Although a correct statement of law, this instruction is irrelevant to Dumeisi's case; no argument was made that he was exempt from the statute. Thus, the district court's decision to refuse this instruction was proper.

Defendant's Proposed Instruction No. 6, more closely related to the argument we summarized above, stated:

> To be guilty of conspiracy, the defendant must have an agreement with at least one person. In considering whether there was at least one other person who was a party to the alleged agreement, you must exclude as potential parties any person acting entirely outside the United States and any person who was a diplomatic or consular officer or attache.

The district court was unpersuaded that this instruction is a correct statement of the law. We agree that it is not. The rule that a conspiracy cannot be established between one criminally-minded individual and a government agent or informer was established to combat the risk of " 'the manufacturing' of crime which might occur if the presence of government agents could create indictable conspiracies." *Mahkimetas*, 991 F.2d at 383 (citation omitted). That risk is not present in this case. On the other hand, at least one of the risks that underlie criminal punishment for conspiracy—that of "concerted action shrouded in secrecy"—is entirely present here.

Only one case interpreting § 951 (actually, its predecessor, 22 U.S.C. § 288) has been cited by the parties. In *United States v. Melekh*, the District Court for the Northern District of Illinois found that a U.N. employee could be convicted of conspiracy to violate the statute, even though

he himself could not have been prosecuted for failure to register. 193 F. Supp. 586, 592 (N.D. Ill. 1961). We agree with the analysis by the district court in that case that the purpose of the act "is to grant a personal exemption to such person as to his own liability for registration. There is no reason to suppose that carte blanche privileges were thereby to be accorded the immune person's activities in respect to third parties not so immune." *Id.* In other words, if there was a real agreement between Dumeisi and IIS agents for Dumeisi to act in the United States as an agent of Iraq without notifying the Attorney General, the diplomatic titles held by those IIS agents cannot save Dumeisi from being prosecuted for the conspiracy. The refusal of the district court to charge the jury with Dumeisi's proposed jury instruction was proper.

### F.  Sufficiency of the Evidence

Dumeisi's final contention is that the evidence elicited at trial was insufficient as a matter of law to support his conviction for all counts. In reviewing a sufficiency challenge, we view all evidence in the light most favorable to the government, defer to the credibility determinations made by the jury, and reverse only when no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Thomas*, 284 F.3d 746, 751 (7th Cir. 2002); *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997).

We first address the conviction for violating 18 U.S.C. § 951, which provides criminal liability for "[w]hoever . . . acts in the United States as an agent of a foreign government without prior notification to the Attorney General[.]" § 951(a). The term "agent of a foreign government" is defined in § 951(d) as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official[.]" Dumeisi argues that

the evidence at trial established nothing more than that he gathered publicly accessible information, published news articles, and communicated with foreign consular officials. To the contrary, there is ample evidence that Dumeisi acted knowingly at the behest of the IIS.

First of all, the correspondence amongst IIS officials contained in the Baghdad File—the trustworthiness of which we have discussed at length—indicates that Dumeisi received payments from the IIS and that he received directions from that organization (as to how to use Zaitawi, for example). Further evidence that Dumeisi was an "agent" of Iraq is his handwritten report on Al-Shammari's activities in Chicago and the telephone records, which were, drawing all inferences in favor of the government, transferred to someone within the IIS in Iraq. In addition to the Baghdad File, there was evidence that Dumeisi initiated contact with the IMUN and offered to publish articles supplied by them; that he received training and was asked to report on Iraqi Opposition activities in the United States; that he had telephone conferences with someone from the IMUN every Thursday afternoon to receive instructions; that he was given a pen like those used by the IIS that could be used as a camera and a tape recorder; that he printed provocative articles in his paper in order to learn more about the Opposition; and that he produced false press passes for IMUN employees to facilitate their access to places which they could not, as diplomats, have gone. Dumeisi's protestations notwithstanding, it is irrelevant that the IIS itself considered Dumeisi a "source" as opposed to a fully vetted "agent." Congress's definition of "agent" for the purpose of § 951 is the only one at issue here, and ample evidence was elicited at trial to satisfy that definition.

Dumeisi's final argument with respect to the § 951 charge is that he did not "knowingly" violate the statute because he did not have knowledge of the requirement to register. He

did not make this argument at trial, and the instruction given by the district court—without objection—required the jury to find that Dumeisi "acted knowingly and that he knew that he had not provided notification to the Attorney General prior to acting in the United States on behalf of Iraq." (R. at 105.) Knowledge of the requirement to register is not an element of § 951.

Dumeisi makes essentially the same "knowledge" argument with respect to the conspiracy count. Again, it is immaterial whether the IIS co-conspirators had knowledge of the registration requirement set forth in § 951. We have already discussed the propriety of the district court's instructions on the law of conspiracy, and there was sufficient evidence elicited at trial to show agreement between Dumeisi and others to violate the law.

The jury found Dumeisi guilty of lying under oath in an immigration proceeding, in violation of 18 U.S.C. § 1621, and before a grand jury, in violation of 18 U.S.C. § 1623. The elements of perjury are (1) testimony under oath before a competent tribunal, (2) in a case in which United States law authorizes the administration of an oath, (3) false testimony, (4) concerning a material matter, (5) with the willful intent to provide false testimony. *United States v. Chaplin*, 25 F.3d 1373, 1377 (7th Cir. 1994).

In the immigration proceeding, Dumeisi responded negatively to the following questions: "Have you ever worked for, on the behest of a foreign government?"; "Have you ever failed to register as an agent of a foreign power?"; and "Have you ever received any property or compensation from a foreign power?" Whether Dumeisi had knowledge of the registration requirement is of no importance in evaluating whether his answers were knowing falsehoods; his knowing receipt of money and property (including a computer, fax machine, and cash payments) from IMUN representatives, for example, renders his answer to the

third question false regardless of any requirement to provide Attorney General notification. Likewise, Dumeisi testified before the grand jury that he had no knowledge of what he did with the phone records on Al-Shammari given to him by Zaitawi. Evidence produced at trial was sufficient for a rational juror to find beyond a reasonable doubt that, as he acknowledged to his friend Rabah, Dumeisi in fact obtained the records from Zaitawi at the request of IMUN personnel and then passed them on to the IMUN.

## III. Conclusion

We conclude that the district court properly admitted the Baghdad File in evidence, that the jury instructions given on newspaper publication and on the law of conspiracy were proper, and that the CIPA and the FISA were properly applied to Dumeisi's case. There was sufficient evidence to convict Dumeisi on all counts. The jury's verdict will not be disturbed, and the conviction is AFFIRMED.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*